**Donald BEARDSLEE, Petitioner–Appellant,**

v.

**Jill BROWN, Warden, of the California State Prison at San Quentin, Respondent–Appellee.**

No. 01–99007.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 28, 2004.

Filed Dec. 29, 2004.

---

Michael Laurence, Barbara Saavedra, Susan Garvey, San Francisco, CA, attorneys, for petitioner-appellant.

Dane R. Gillette, Deputy Attorney General, San Francisco, CA, for respondent-appellee.

Before TASHIMA, THOMAS and PAEZ, Circuit Judges.

THOMAS, Circuit Judge.

Donald Beardslee seeks federal habeas relief pursuant to *Sanders v. Woodford,* 373 F.3d 1054 (9th Cir.2004), a decision recently issued by this Court. Beardslee was convicted by a jury in San Mateo County, California, of two counts of first degree murder with special circumstances and sentenced to death. The California Supreme Court affirmed his conviction and sentence. *People v. Beardslee,* 53 Cal.3d 68, 279 Cal.Rptr. 276, 806 P.2d 1311 (1991) (*"Beardslee I "*). Beardslee filed a habeas corpus petition in federal district court. The district court rejected each of his claims and dismissed the petition. We affirmed the district court's denial of habeas relief, *see Beardslee v. Woodford,* 358 F.3d 560 (9th Cir.2004), and the Supreme Court denied Beardslee's petition for a writ of certiorari, *see Beardslee v. Brown,*

— U.S. ——, 125 S.Ct. 281, 160 L.Ed.2d 68 (2004).

After denial of certiorari, but before the mandate was issued, Beardslee requested the issuance of an expanded certificate of appealability, arguing that he is entitled to relief under our decision in *Sanders,* a decision that was issued during the pendency of his petition for a writ of certiorari. In *Sanders,* we determined that the California Supreme Court, after invalidating two of four special circumstances, had failed to reweigh the mitigating and aggravating factors considered by the jury in imposing a death sentence or apply the correct harmless error standard. 373 F.3d at 1063. We held that this error had a substantial and injurious effect on the jury's verdict, and thus granted the writ. *Id.* at 1067–68 (citing *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

In the case before us, the California Supreme Court invalidated three of Beardslee's four special circumstances. *See Beardslee I,* 279 Cal.Rptr. 276, 806 P.2d at 1324–38. As in *Sanders,* the California Supreme Court did not review the effect of the special circumstances error on the jury's verdict under the harmless beyond a reasonable doubt standard. *See id.; cf. Sanders,* 373 F.3d at 1063; *see also People v. Sanders,* 797 P.2d 561, 590 (Cal.1990). We concluded that "[r]easonable jurists could debate whether, 'in light of the record as a whole,' the three invalid special circumstances had a 'substantial and injurious effect or influence' on the jury's death penalty verdict and therefore whether the error was not harmless." *Beardslee v. Brown,* 2004 WL 2965969, at *2 (9th Cir. Dec.16, 2004) (applying *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710, harmless-error standard). In view of the change in the law caused by *Sanders,* we granted a temporary stay of the issuance of the mandate

and, after briefing and oral argument, granted a certificate of appealability on the *Sanders* issue. *Id.* While this matter was pending, the State sought and obtained an execution date of January 19, 2005.

In view of the execution date, we ordered expedited briefing and oral argument.[1] After consideration of the briefs, oral argument, and the record, we conclude that, although the jury was instructed that it should consider the invalid special circumstances findings in its penalty determination, this error did not have a substantial and injurious effect on the verdict. Therefore, we deny relief and again affirm the judgment of the district court.

**I**

The essential facts of this case were described in our initial opinion, 358 F.3d at 565–68, and in the opinion of the California Supreme Court, 279 Cal.Rptr. 276, 806 P.2d at 1315–1318. While on parole for a murder in Missouri, Beardslee was charged with and convicted of the first degree murders of Paula (Patty) Geddling and Stacy Benjamin with premeditation and deliberation pursuant to Cal. Pen. Code, §§ 187, 189. The jury also found the special circumstances of concurrent conviction of multiple murders, *id.* at § 190.2(a)(3), and intentional killing for the

purpose of preventing the victim from testifying as a witness to a separate crime *id.* at § 190.2(a)(10), true for each victim. A separate jury was empaneled for the penalty phase trial. It returned a sentence of death for the murder of Geddling and a sentence of life without possibility of parole for the murder of Benjamin.

On direct appeal, the California Supreme Court reversed one multiple-murder special circumstance, but found the error harmless. 279 Cal.Rptr. 276, 806 P.2d at 1338. The court reversed both of the witness-killing special circumstances, but also found the errors harmless. *Id.* at 1324. In neither case did the court analyze specifically whether the error was harmless beyond a reasonable doubt.

In *Sanders*, we determined that California employed a "weighing" system for capital cases. A weighing death penalty regime is one in which " 'the sentencer [is] restricted to a weighing of aggravation against mitigation' and 'the sentencer [is] prevented from considering evidence in aggravation other than discrete, statutorily-defined factors.' " *Sanders*, 373 F.3d at 1061 (alterations in original) (internal quotation marks omitted) (quoting *Williams v. Calderon*, 52 F.3d 1465, 1477 (9th Cir. 1995)).[2] Under a weighing system, "the

1. Although the parties were under significant time pressure, both parties supplied thorough and thoughtful briefs and made excellent oral presentations. The panel expresses its appreciation to counsel for their professionalism.

2. As explained further in *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), in a weighing death penalty regime, "after a jury has found a defendant guilty of capital murder and found the existence of at least one statutory aggravating factor, it must weigh the aggravating factor or factors against the mitigating evidence." *Id.* at 229, 112 S.Ct. 1130. By contrast, in a non-weighing state, "the jury must find the existence of one aggravating factor before impos-

ing the death penalty, but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case." *Id.* at 229–30, 112 S.Ct. 1130. In non-weighing regimes, "aggravating circumstances serve only to make a defendant eligible for the death penalty and not to determine the punishment...." *Clemons v. Mississippi*, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). In such states, "the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial. These circumstances relate both to the offense

jury's sentencing discretion is not boundless—it must consider the defined list of aggravating factors." *Id.* at 1062. In weighing states, there is Eighth Amendment error (i.e., a lack of an individualized sentencing determination) "when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision to impose a death sentence." *Id.* at 1059 (quoting *Sochor v. Florida,* 504 U.S. 527, 532, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992)). Thus, as we noted in *Sanders:*

an appellate court's invalidation of one or more of the sentencing factors may have a serious effect on individualized sentencing, because there is a real risk that the jury's decision to impose the death penalty rather than life imprisonment may have turned on the weight it gave to an invalid aggravating factor.

*Id.* at 1062.

■ *Sanders* held, however, on direct appeal that a remand for resentencing is not necessarily required to correct such an error. *Id.* at 1059. A state appellate court that invalidates an aggravating factor in a capital case may: "(1) remand for resentencing; (2) independently reweigh the remaining aggravating and mitigating circumstances under the procedure set forth in *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), in which the state appellate court reweighs aggravating and mitigating circumstances that have already been found by a jury to exist; or (3) independently conclude that the sentencing body's consideration of the invalid aggravating circumstance was harmless beyond a reasonable

and the defendant." *Stringer,* 503 U.S. at 230, 112 S.Ct. 1130 (quoting *Zant v. Stephens,* 462 U.S. 862, 872, 103 S.Ct. 2733, 77 L.Ed.2d 235, (1983)).

doubt." *Id.* at 1060 (internal citations and quotation marks omitted).

■ Even if a state appellate court has not conducted such an analysis, a petitioner is not automatically entitled to federal habeas relief. *Id.* To grant relief, we must first conduct a separate harmless error analysis pursuant to *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710, in order to determine whether the error "had a substantial and injurious effect" on the jury's verdict. *Sanders,* 373 F.3d at 1060 (citing *Morales v. Woodford,* 336 F.3d 1136, 1148 (9th Cir. 2003), *amended by* 388 F.3d 1159 (9th Cir.2004)).

Thus, to prevail on the merits of his *Sanders* Eighth Amendment claim, Beardslee must demonstrate: (1) that his sentencing jury weighed an invalid special circumstance; (2) that the California Supreme Court did not properly review his claim by either independently reweighing the aggravating and mitigating factors or by finding the sentencing error harmless beyond a reasonable doubt;[3] and (3) that the error had a "substantial and injurious effect or influence" on the jury's verdict.

## II

### A

■ Beardslee's penalty phase jury unquestionably considered invalid factors in reaching its death penalty verdict. Four death-qualifying special circumstances were presented to Beardslee's penalty phase jury: two witness-killing special circumstances and two multiple-murder special circumstances (one of each for the murder of Stacy Benjamin and one of each

3. The state appellate court also has a third option for correcting any constitutional error: remanding for re-sentencing. *Sanders,* 373 F.3d at 1060. The California Supreme Court did not do so in this case, so only the other two options will be discussed.

for the murder of Patty Geddling). The California Supreme Court invalidated both witness-killing special circumstances, since that special circumstance applies only to "the intentional killing of a person who witnessed a crime committed prior to, and separate from, the killing for the purpose of preventing the victim from testifying about the crime witnessed." *Beardslee I,* 279 Cal.Rptr. 276, 806 P.2d at 1325 (citation omitted). For the witness-killing circumstance to apply, "[t]he crime witnessed cannot be deemed prior to, and separate from, the killing when both are part of the same continuous criminal transaction." *Id.* (internal citations and quotations omitted). The California Supreme Court also held that Beardslee was erroneously charged with two multiple-murder special circumstances (one for each crime), which was impermissible double counting. *Id.* at 1339.

The California Supreme Court invalidated three of the four special circumstances in Beardslee's case, so there is no dispute that Beardslee's jury considered improper factors in reaching its death sentence. Thus, we agree with Beardslee that the jury improperly weighed invalid special circumstances in violation of the Eighth Amendment.

B

Given the jury's improper consideration of invalid special circumstances, the next question is whether that error was harmless. In determining whether the error was harmless, *Clemons, Stringer,* and *Sanders* require the state appellate court to undertake an independent analysis of the effect of the error on the jury's verdict. Thus, to prevail on this element of his Eighth Amendment claim, Beardslee must show that the California Supreme Court did not properly review the effect of the error by either reweighing the aggravating

and mitigating factors without the invalid special circumstances or by determining that any error was harmless beyond a reasonable doubt. *Sanders,* 373 F.3d at 1060.

■ After invalidating the three special circumstances, the California Supreme Court found that the constitutional error was not prejudicial. *Beardslee I,* 279 Cal. Rptr. 276, 806 P.2d at 1339. As to the additional multiple-murder special circumstance, the court stated:

> We have consistently found such double counting harmless because it did not result in the jury considering any inadmissible evidence. The jury knew there was a total of two murders. It is even more clearly harmless here since the jury returned a separate penalty verdict as to each murder. Each verdict form had only one multiple-murder finding attached to it. The jury imposed the death penalty only as to one of the murders.

*Id.* (citation omitted).

Although the California Supreme Court did not expressly find that the error was harmless beyond a reasonable doubt as required by *Clemons,* 494 U.S. at 753, 110 S.Ct. 1441, it is evident from its discussion that the court analyzed the critical factors that led to its conclusion that the error was harmless. It was obvious to the jury that Beardslee had committed two murders, and the California Supreme Court recognized that the jury returned separate and distinct verdicts for each. In light of this explanation, the court's use of the "clearly harmless" language, and the court's consistent history of finding the double counting of multiple-murder special circumstances harmless beyond a reasonable doubt, we conclude that the California Supreme Court actually and properly determined that the jury's consideration of one of the invalid multiple-murder special

circumstances was harmless beyond a reasonable doubt.

▉ As to the invalid witness-killing special circumstances, the court assessed the prejudice as follows:

Defendant also contends the erroneous findings of the witness-killing special circumstance were prejudicial. Again, however, the jury properly considered all the *evidence*, including the motives for the murders. The court instructed the jury not to merely count the number of factors but to give each the weight to which it was entitled. We cannot conclude the jury could reasonably have given the inapplicable special circumstances any significant independent weight.

*Id.* (emphasis in original) (citation omitted). The above passages constituted the entire reweighing and harmless error analysis conducted by the California Supreme Court regarding the invalid witness-killing special circumstances.

In *Sanders*, we held that "[w]e cannot uphold a state appellate court's harmless error review as adequate when we have substantial uncertainty about whether the state court actually concluded that the invalid aggravating factor was harmless beyond a reasonable doubt." 373 F.3d at 1063. In *Sanders*, we held the California Supreme Court's review inadequate, noting that the court "never used the words 'harmless error' or 'reasonable doubt' in analyzing the effect of removing the special circumstance" and that the court seemed to have erroneously applied the rule of *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), which applies only in nonweighing states, upholding the verdict "despite the invalidation of two special circumstances because it was upholding other special circumstances." *Sanders*, 373 F.3d at 1064. Because the appropriate analytical framework was es-

tablished by *Clemons*, which applies to weighing states, and not by *Zant*, we concluded in *Sanders* that the California Supreme Court "did not find, as it was required to do, that the error was 'harmless beyond a reasonable doubt.'" 373 F.3d at 1063.

In *Beardslee*, the California Supreme Court devoted only three sentences to its analysis of whether Beardslee was prejudiced by the invalid witness-killing special circumstances. As in *Sanders*, the California Supreme Court did not use the words "reasonable doubt." Unlike its discussion of the double-counted multiple-murder special circumstance, the California Supreme Court did not use the phrase "clearly harmless." To be sure, we do not require "a particular formulaic indication by state courts before their review for harmless federal error will pass federal scrutiny." *Sochor*, 504 U.S. at 540, 112 S.Ct. 2114. However, it is apparent from the decision that the California Supreme Court did not consciously undertake an analysis of whether the error was harmless beyond a reasonable doubt. It would require too much inferential reasoning from the few terse statements in the opinion for us to conclude that the California Supreme Court was, in fact, conducting a *Chapman* harmless error examination. *See id.* ("[W]hen the citations stop as far short of clarity as these do, they cannot even arguably substitute for explicit language....."). It is certainly not possible to ascertain from the text of the court's opinion whether the court was analyzing the error under *Clemons*, rather than under *Zant*.

Therefore, we also agree with Beardslee that, as to the California Supreme Court's consideration of the witness-killing special circumstances, Beardslee's Eighth Amendment rights were violated, and the California Supreme Court did not undertake a

proper independent review to determine whether the error was harmless.

### III

In opposition to this conclusion, the State contends that *Sanders* was wrongly decided—that California is *not* a weighing state. However, a three judge panel cannot, absent exceptional circumstances not present here, overrule Ninth Circuit precedent. *See Benny v. U.S. Parole Comm'n,* 295 F.3d 977, 983 (9th Cir. 2002) ("We are bound by decisions of prior panels unless an en banc decision, Supreme Court decision or subsequent legislation undermines those decisions.").[4]

The State also contends that application of *Sanders* is barred by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Subject to a few exceptions, *Teague* held that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Id.* at 310, 109 S.Ct. 1060. If *Teague* precluded relief in this case, it necessarily would have precluded relief in *Sanders,* which it did not.[5]

Regardless, *Sanders* did not create a new constitutional rule; it applied existing constitutional rules to California's death penalty system. If application of existing precedent determined that the

holding "was required by the Constitution," then the *Teague* bar does not apply. *See Lambrix v. Singletary,* 520 U.S. 518, 527, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).[6]

*Sanders* applied the Supreme Court's analysis in *Clemons* to California's death penalty statute. It did not create a new constitutional rule of criminal procedure; rather, it applied an existing one. Put another way, the determination that California was a weighing state within the meaning of *Clemons* did not establish a new rule of criminal procedure. The applicable rule was created by *Clemons* and its predecessors.

Most significantly, the Supreme Court has held that *Clemons* itself did not create a new rule of criminal procedure within the meaning of *Teague.* *Stringer,* 503 U.S. at 234–35, 112 S.Ct. 1130. Indeed, in *Stringer,* the Supreme Court rejected an argument similar to the one made by the State in this case in holding that applying existing constitutional rules to different state sentencing schemes did not implicate *Teague.* *Stringer,* 503 U.S. at 229, 112 S.Ct. 1130.

*Clemons* has been applied numerous times since it was announced. No circuit has yet determined that the application of *Clemons* to a different statutory scheme constituted a new constitutional rule of criminal procedure precluded by *Teague.*

---

**4.** *Sanders* is not yet final. The mandate has not issued and the time to petition for a writ of certiorari has not expired. Under other circumstances, we would exercise prudential caution and defer consideration of this issue until *Sanders* became a final decision. However, given that the State has established an execution date in this case prior to the time *Sanders* will become final, we must proceed under the current law of the Circuit.

**5.** The State informed us at oral argument that it did not raise a *Teague* defense in *Sanders.*

Thus, it contends that because the *Sanders* panel did not address *Teague,* the *Teague* question is properly before us.

**6.** To the extent the State argues that *Sanders* is a new rule because *Clemons* has no application to California's sentence selection phase, the State is in effect arguing that *Sanders* was incorrectly decided, which is an argument that we cannot consider as a three judge panel.

See *Coe v. Bell,* 161 F.3d 320, 334 (6th Cir.1998); *Jones v. Murray,* 976 F.2d 169, 173 (4th Cir.1992); *Smith v. Black,* 970 F.2d 1383, 1385 (5th Cir.1992). Thus, we conclude that *Sanders* did not announce a new rule of criminal procedure within the meaning of *Teague,* and Beardslee's claim is not *Teague*-barred.

## IV

■ As we have noted, our determination that an Eighth Amendment error occurred does not automatically entitle Beardslee to federal habeas relief. "[W]e must also apply our own harmless-error analysis to determine whether the Eighth Amendment error had a substantial and injurious effect or influence on the jury's verdict." *Sanders,* 373 F.3d at 1064. That analysis is required by *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710. Under *Brecht,* "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless." *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

Thus, we have declined to grant federal habeas relief when a jury's consideration of an invalid special circumstance was harmless within the meaning of *Brecht.* See *Morales,* 388 F.3d 1159, 1172–73 (9th Cir.2004). Under the circumstances presented here, we conclude that the Eighth Amendment error did not have a substantial and injurious effect on the jury's verdict.

As noted, the California Supreme Court invalidated both witness-killing special circumstances because the killing was part of "the same continuous criminal transaction," rather than a killing that was subsequent to, and separate from, the crime "for the purpose of preventing the victim from testifying about the crime witnessed." *Beardslee I,* 279 Cal.Rptr. 276, 806 P.2d at 1325. The court reversed one of the two multiple-murder special circumstances as duplicative. *Id.* at 1339. Thus, the key question is whether the jury's consideration of the two witness-killing special circumstances had a substantial and injurious effect on its verdict.

■ Beardslee argues that invalid witness-killing special circumstances are inherently aggravating because they convey intent, cunning, goal-driven behavior, planning, and criminal propensity. In essence, Beardslee is suggesting that a penalty phase jury's consideration of an invalid witness-killing special circumstance amounts to structural error. However, we have previously applied a harmless error analysis to a jury's consideration of invalid special circumstances. See, e.g., *Williams v. Calderon,* 52 F.3d 1465, 1476 (9th Cir. 1995) (holding that an invalid kidnapping special circumstance finding was subject to harmless error review). There is nothing sufficiently unique about a witness-killing special circumstance, particularly when compared to the kidnapping special circumstance at issue in *Williams,* that would immunize it from harmless error analysis.

■ A careful examination of the penalty phase transcript and the verdict itself indicates that the witness-killing special circumstances did not play a significant role in the penalty phase jury's decision.

As Beardslee rightly points out, the prosecutor included the witness-killing special circumstances in his opening statement to the penalty phase jury. The prosecutor reminded the penalty phase jury that the prior jury had convicted Beardslee of two first degree murders with two special circumstances—multiple murders and witness killing—for each murder. The prosecutor also contended that Beard-

slee was determined to cover up or destroy all evidence of what had happened in his apartment, an argument that could be construed as supporting the special circumstance. The prosecutor also argued that Beardslee considered killing Bill Forrester because he too was a potential witness. According to the prosecutor, the only fear that Beardslee had was the fear of being caught by the police for what happened in his apartment. Therefore, the prosecutor reasoned, Beardslee had to get rid of not just the physical evidence, but also both women. The prosecutor contended that Stacy Benjamin had to be killed not only because she was a witness to the crimes in Beardslee's apartment, but also because she was a witness to the events leading up to Patty Geddling's murder.

However, significantly, virtually all of these arguments could have been made to the jury even if the special circumstance verdict had not existed because the prosecutor was entitled to discuss the circumstances of the crimes. Further, although the prosecutor mentioned the witness-killing special circumstances and related matters in his opening statement, his opening centered around other aspects of the case. He emphasized that Beardslee was responsible for three murders: two in California and one in Missouri. He argued that the separate circumstances of each murder showed "evilness and depravity," demonstrating that Beardslee was a "cold-blooded murderer." He underscored the "unspeakable depravity and callousness" in the "very brutal murders, each one unique in the way they were slaughtered." The prosecutor highlighted the fact that Patty Geddling had begged for her life before she was killed, and that Beardslee had done it alone, later telling his cohort Frank Rutherford that he had "to finish" when others backed out. The prosecutor emphasized that Beardslee acted alone when he killed Geddling.

The prosecutor also told the jury that Beardslee murdered Benjamin when Rutherford's attempts had been unsuccessful, and that Rutherford and Beardslee had agreed on the plan to murder Benjamin. The prosecutor further informed the jury of the circumstances surrounding the prior Missouri murder, concluding with the statement that "[t]hree murders is enough." In context, the witness-killing circumstance played a small part in the prosecutor's opening statement.

At the penalty phase, approximately twenty-eight witnesses testified over some 748 pages of transcript. The witness-killing special circumstances were specifically addressed in only a handful of transcript pages, involving a little over 500 transcript lines out of over 19,000 lines of transcript. The bulk of the prosecution evidence was directed at the circumstances of the crime and Beardslee's prior murder in Missouri.

The witness-killing theory was discussed specifically with just one witness, defense psychiatrist Dr. Wilkinson, who spoke directly to the prosecution's theory that Beardslee killed these women because they were witnesses to crimes that had occurred in Beardslee's apartment. After the defense elicited testimony from Dr. Wilkinson that there was no logical or easily understandable motive for the murders, the prosecutor attempted to establish his witness-killing theory on cross-examination. However, over nineteen pages of transcript, Dr. Wilkinson consistently rebuffed this theory. Although Dr. Wilkinson agreed that witness-killing was a conceivable motive, he strongly disagreed that this theory explained these murders. Among other reasons, Dr. Wilkinson noted that there were many other people involved in the incident who were not killed, so the theory did not make practical sense. Dr. Wilkinson never retreated from his pri-

mary theory that psychological considerations were the primary motivating factor.

After Dr. Wilkinson's testimony, the prosecutor all but abandoned the witness-killing theory as a rationale for imposing the death penalty. In his closing argument, he briefly referenced the two witness-killing special circumstances found by the guilt phase jury and referred to the witness-killing theory during the initial part of his closing. However, the prosecutor never urged the jury to impose the death penalty based on the theory of witness-killing. To the contrary, the prosecutor's primary arguments for death were that Beardslee deserved to die because of the gruesome circumstances of the women's deaths, Beardslee's dangerousness, the fact that Beardslee had killed before, and that Beardslee had no defenses to the two murders. Aside from the brief mention of the special circumstances at the beginning of his closing argument, there is nothing in the prosecutor's closing remarks that would have been precluded by the elimination of the invalid special circumstances findings.

Defense counsel did not discuss the witness-killing special circumstances in his closing. Rather, he argued the central defense theory that Beardslee was mentally impaired and driven in his actions by fear of Rutherford. He highlighted Beardslee's good qualities, indications of compassion, his ability to be rehabilitated, his good work performance, and his history of mental difficulties. In short, little attention was paid during closing arguments to the special circumstances in question.

In sum, when the penalty phase trial is examined in its entirety, very little would have been altered if the witness-killing special circumstances had been omitted from consideration. All of the gruesome details of the crime would have been ad-mitted, evidence of the prior Missouri murder would have been introduced, the circumstances showing premeditation and planning would have been presented, and the testimony concerning Beardslee's lack of remorse would have been heard.

However, perhaps the most persuasive indication that the witness-killing special circumstance findings played little role in the jury's deliberation is the verdict itself. The jury imposed the death penalty for the murder of Patty Geddling but not for the murder of Stacy Benjamin. Both women were witnesses to the initial shooting of Patty Geddling, but the jury returned death for the murder of one, but not the other. Geddling was the initial victim. She was the one first shot by Rutherford. At trial, both parties proceeded under the assumption that Rutherford's shot was the result of an accidental discharge of the shotgun. Beardslee took Geddling away from the apartment on the pretext of transporting her to a hospital; instead, he took her into a wooded area and shot her in the head at point blank range with a gun he brought with him from the apartment.

Had the jury attached significance to the theory that Beardslee killed both women because they were witnesses to a crime, the jurors would have likely imposed a death sentence for both murders. Alternatively, because Stacy Benjamin witnessed both the accidental shooting of Patty Geddling in the apartment and had knowledge of Geddling's subsequent murder, in theory the jury would have been more likely to return a death sentence for the murder of Stacy Benjamin. Instead, the jury imposed a death sentence for the crime in which Beardslee was the primary actor, but not for the crime in which Beardslee was a participant.

The jury viewed the murder of Geddling differently, and the circumstances of the

two crimes were different. Beardslee administered the directly fatal shots to Geddling; Rutherford was not present, a fact that the prosecutor highlighted in his closing argument. Thus, the mitigating factor of Beardslee's fear of Rutherford—one of the primary theories urged by the defense—arguably was not present. Indeed, this contravenes Beardslee's argument that the witness-killing special circumstances prevented the jury from giving weight to the mitigation evidence. As the prosecutor emphasized in closing, the course of events surrounding the Geddling murder indicated that Beardslee acted out of deliberate, conscious choice.

In contrast, Rutherford initiated the killing of Benjamin by strangling, and Beardslee assisted. The most logical explanation for the split verdict is that the jurors considered the mitigating factors significant as to the crime in which Rutherford was present, but did not consider those factors sufficiently mitigating for Geddling's murder, when Rutherford was absent. However, we need not resort to inference or conjecture. The plain fact is that the jury differentiated between the circumstances surrounding the two crimes; therefore, it was the difference between the crimes that was crucial, not the commonality of any particular aggravating factor. As such, it is not possible to conclude that the common special circumstance of witness-killing was a substantial factor in the jury's decision to impose the death penalty for the murder of Geddling but not for the murder of Benjamin.

For these reasons, we are not left with grave doubt about whether the jury's consideration of the invalid special circumstances had a substantial and injurious effect on the jury's verdict. Even if the two witness-killing and one multiple-murder special circumstances had been removed from consideration, as they should

have been, the presentation of evidence and argument during the penalty phase would not have been materially different. Further, the jury's verdict of life without parole for one murder and the imposition of the death penalty for the other indicates that the invalid special circumstance applicable to both crimes did not substantially influence the jury's ultimate verdict. We affirm the judgment of the district court denying Beardslee's petition for a writ of habeas corpus.

**AFFIRMED.**